# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| AMERISOURCE CORPORATION | CIVIL ACTION NO. 02-0046 |
| VERSUS | JUDGE ROBERT G. JAMES |
| PROFESSIONAL PHARMACY SERVICES, INC. AND THERON TIMOTHY JACKS | MAG. JUDGE JAMES D. KIRK |

## OPINION

This is an action brought by Amerisource Corporation ("Amerisource") against Defendants Professional Pharmacy Services, Inc. ("PPSI") and Theron Timothy Jacks ("Jacks"). At trial in this matter, Amerisource orally moved for judgment against PPSI. Based on the record, including those exhibits previously presented at a preliminary injunction hearing, the Court granted Amerisource's motion. Therefore, only the claims against the individual Defendant, Jacks, remain pending.

Amerisource has asserted two claims against Jacks. In Count IV, Amerisource contends that Jacks is the alter ego of PPSI and that the Court should pierce the corporate veil to hold him individually liable for the actions of the corporation. In Count V, Amerisource contends that Jacks intentionally interfered with the contractual relations between PPSI and Amerisource and should be held liable on this basis as well.

## JURISDICTION

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between Amerisource and the two Defendants, and the amount in controversy

exceeds $75,000.00, exclusive of interest and costs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

### A. FINDINGS OF FACT

Amerisource is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. PPSI is a Louisiana corporation with its principal place of business in Monroe, Louisiana. Jacks is an adult individual who resides in Monroe, Louisiana.

In November 1992, Amerisource and PPSI entered into a service agreement. Amerisource, through its Dallas, Texas, and Paducah, Kentucky divisions, agreed to provide PPSI with pharmaceuticals and other merchandise. PPSI agreed to pay for these items. Amerisource invoiced PPSI for the items on an on-going basis.

The parties continued under this agreement until 1997.

On July 14, 1997, PPSI filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Western District of Louisiana. At the time, PPSI had three shareholders: Reginald G. Kitchens ("Kitchens") (40% of the stock), Jacks (40% of the stock), and Bruce Bond ("Bond") (20% of the stock). Kitchens was the President of PPSI, Jacks was the secretary/treasurer, and Bond was a former employee.[1]

---

[1] Bond left PPSI in 1997.

On July 20, 1998, the Bankruptcy Court entered an order confirming PPSI's Second Amended Plan of Reorganization ("the Plan"). The "basic premise" of the Plan was to allow PPSI to "retain all of its property and continue its operations." [Doc. No. 115, Exh. 1, Plan at III. A. 1.]. In return, PPSI agreed to "satisfy its creditors" according to the provisions of the Plan. [Doc. No. 115, Exh.1, Plan at III. A. 1.]. The Plan provided for seven classes of creditors. Amerisource held an unsecured claim for $437,382.11 (plus 6% interest from July 20, 1998)[2] and was deemed a Class 5 creditor.

Under the Plan, PPSI agreed to use cash flow from its operations to pay its creditors. Once the claims of Class 1-4 creditors were fully satisfied, PPSI's "Net Cash Flow" was to be calculated and used to satisfy the claims of Class 5 and Class 6 creditors.

The Plan provides as follows with regard to payment of Class 5 creditors:

> B. Satisfaction of Class 5 Unsecured Non-Priority Claims
>
> 1. Distributions from Net Cash Flow
>
> a. Thirty (30%) of the debtor's Net Cash Flow shall be dedicated to the payment of un-secured [sic] creditors. The debtor shall retain the remaining Net Cash Flow for operations.
>
> b. Net Cash Flow accounting shall begin for purposes of distributions to creditors in Class 5 with the fourth (4) calendar month after confirmation. All cash flow accumulations by the debtor prior to said month shall be retained for operations.

---

[2] Interest was to accrue on the claim of a Class 5 creditor at a rate of 6% per annum "from the date of confirmation until such claim is satisfied in full." [Doc. No. 115, Exh.1, Plan at III. D. 5].

      c.      Payments to Class 5 creditors under the terms set forth herein shall commence on the twenty-fifth (25th) day of the fifth calendar month after confirmation with the distribution of Net Cash Flow from the preceding month.

      d.      The Net Cash Flow payments shall be made monthly to the debtor's disbursing agent who shall deposit said payment into an interest bearing account. When said account reaches a balance of $10,000.00 the disbursing agent shall make a distribution to Class 5 creditors.

      e.      The debtor will continue payments to creditors in Class 5 according to these provisions until Class 5 creditors are paid in full.

      f.      Creditors in Class 5 shall not retain any interest in the properties of the estate and shall seek satisfaction only from these provisions.

[Doc. No. 115, Exh. 1, Plan at Article III B.].

The Plan further defines "Net Cash Flow" as follows:

> . . . those funds remaining from debtor's operations after payment in full postpetition operating costs and expenses, including, but not limited to, capital improvements, repairs, maintenance, replacements, loans, rentals, taxes, lease payments, postconfirmation professional fees and the payments to creditors in Classes 1-4.

[Doc. No. 115, Exh. 1, Plan at Article III. A. 4.].

PPSI agreed to keep "its books and records in accordance with generally accepted accounting principles" ("GAAP") and to calculate its Net Cash Flow monthly. [Doc. No. 115, Exh. 1, Plan at Article III A. 4(b)].

The Plan also provided that the "salaries of the officers shall be continued after confirmation at the same rates as approved by the Court during the administration of this case."

[Doc. No. 115, Exh. 1, Plan at Article III. C. 3].

Prior to the time for the Net Cash Flow calculations to begin, Kitchens died. PPSI had a $1,000,000.00 key-person life insurance policy on Kitchens. The policy was paid to PPSI on September 30, 1998, and PPSI used these proceeds to pay off Class 1-4 creditors.

In November 1998, PSI was supposed to begin reporting its Net Cash Flow to Class 5 creditors and placing 30% of its positive Net Cash Flow into an interest-bearing account each month. The deposited amount was then to be distributed to Class 5 creditors beginning in December 1998.

As of 2001, PPSI had not provided financial reports or made any payments to Amerisource. Accordingly, on March 14, 2001, Amerisource filed a motion to re-open PPSI's bankruptcy case to enforce the Plan. *See In re Professional Pharmacy Services, Inc.*, Docket No. 97-31369, United States Bankruptcy Court, Western District of Louisiana [Doc. No. 151]. However, on May 9, 2001, after conducting a hearing, the Bankruptcy Court denied Amerisource's motion and declined to re-open the case. *See id.* [Doc. Nos. 157 & 158].

On June 9, 2002, Amerisource filed this action. In its original Complaint, Amerisource brought suit only against PPSI for breach of contract and for an accounting.

After conducting discovery, including a review by its expert of PPSI's financial records, Amerisource moved to amend its Complaint. On July 1, 2004, Magistrate Judge James D. Kirk granted Amerisource's leave to file an amended complaint over PPSI's objection. In the amended complaint, Amerisource brought three causes of action against PPSI: appointment of receiver (Count I), for an accounting of PPSI's books and records (Count II), and breach of

5

contract (Count III).

Amerisource also brought two causes of action against Jacks individually: to pierce the corporate veil (Count IV) and intentional interference with contractual relations (Count V). By this time, Jacks had purchased all stock in PPSI, so that he had become the sole stockholder, Chief Operations Officer, and Chief Executive Officer.[3]

On February 18, 2005, Amerisource filed a motion for the appointment of a temporary receiver. That motion was scheduled for hearing before Magistrate Judge Kirk on March 28, 2005. However, Amerisource and PPSI and Jacks were able to reach a joint stipulation on the appointment of a temporary receiver. Under the terms of that stipulation, the parties agreed to select an independent accountant to review the records of PPSI. The independent accountant was to have access to all of PPSI's financial records during normal business hours, be provided with unopened bank statements, and be paid by PPSI. The stipulation also provided specific requirements regarding the financial operating procedures of PPSI, salaries paid to Jacks and family members of Jacks, Kitchens and Bond, and limited the expenses PPSI could incur.

The parties selected James Lowery ("Lowery"), a Certified Public Accountant ("C.P.A.") in Monroe, to serve as temporary receiver. However, when he began his duties in April 2005, Lowery could not obtain copies of PPSI's monthly financial statements, general ledger details,

---

[3]Amerisource contends that Jacks purchased all the stock in PPSI within a "couple of years" of Kitchens' death. However, in Finegan's report he refers to Jacks' deposition testimony that he purchased Bond's stock in 2002 and Kitchen's stock in 2003. [Doc. No. 101, Exh. 2, p. 2]. Amerisource did not provide a copy of Jacks' deposition, ask Jacks during trial when the stock was actually purchased, or provide any other evidence of the stock transfer. Therefore, while it is undisputed that Jacks is the sole stockholder in PPSI, it is unclear exactly when he became the sole stockholder.

and bank reconciliations. Lowery learned from PPSI's accountant, Gary Boothe ("Boothe"), that his firm had been retained only to reconstruct PPSI's financial records and statements for 2001, 2002, 2003, and 2004, not to prepare financial statements or perform accounting work in 2005. Lowery reviewed the PPSI financial records available and prepared reports for April, May, June, and August without benefit of the 2005 current financial statements or general ledger. Prior to preparing his September 2005 report, Lowery obtained general ledger statements from Boothe for January through June 2005. No further general ledger statements were available to Lowery at the time he prepared a final report in November 2005.

According to Lowery's report and affidavit, during this time period, PPSI generally adhered to the terms of the stipulation, except that PPSI made payments on Jack's personal credit card account and failed to pay Lowery for his services.

On March 24, 2006, the Court held a hearing on Amerisource's motion for a preliminary injunction. Amerisource filed the affidavits and reports of Lowery and its expert, Douglas Finegan ("Finegan"), into the record, and the Court heard testimony from Jacks.

On April 3, 2006, the Court granted a preliminary injunction to Amerisource. In that ruling, the Court found the affidavit and reports from Lowery showed that PPSI and Jacks failed to provide necessary financial information to him, so that he could complete his review and determine whether PPSI was in compliance with the Plan and the Court's orders. The Court further found that PPSI violated the stipulation by failing to pay Lowery for his services.

The Court also found that Finegan's affidavit showed that PPSI failed to apply generally accepted accounting principles and properly manage PPSI's cash box, affecting the accuracy of its books. The Court accepted Finegan's expert opinion that PPSI is or has been paying

7

excessive salaries to Jacks and his family and making payments on personal loans to Kitchens.

Finally, the Court relied on Jacks' own testimony. He admitted that he took money from the cash reserve box for personal living expenses, although he characterized them as "loans from [his] payroll." He also admitted that he previously said he would "shut down" PPSI this year, but explained that he meant PPSI would "shut itself down" when there is no longer money to operate it.

Based on the evidence, the Court determined that Amerisource met the requirements for obtaining preliminary injunctive relief. The Court also ordered that a temporary receiver be appointed. However, on April 27, 2006, Amerisource moved to stay the appointment on the basis that PPSI was in such dire financial condition that payment of a receiver might cause its closure. The Court granted that motion on May 11, 2006. No party moved to lift the stay prior to trial.

Trial was held on July 17, 2006. Maurice Mitts and Michael Walshe represented Amerisource. PPSI was unrepresented, but Jacks represented himself.[4]

At trial, Amerisource relied on the affidavits and expert reports of Lowery and Finegan presented at the preliminary injunction hearing, but also presented Finegan as a witness. Jacks cross-examined Finegan and also testified on his own behalf. The Court gleaned the following facts from the record and the trial testimony.

Finegan and another C.P.A. from his office spent a day or two at PPSI reviewing

---

[4]Rex Rainach ("Rainach"), the attorney for Jacks and PPSI, was allowed to withdraw on March 24, 2006, prior to the hearing on the motion for preliminary injunction. PPSI has been unrepresented since that time, and Jacks has represented himself, *pro se*.

8

documents in fall or late 2003. Finegan met with PPSI's then-accountant, Don Wright.[5] He and his associate also reviewed documents available at the office of Boothe, PPSI's then-former accountant. After reviewing the documents available from PPSI and Boothe; additional documents Amerisource obtained in discovery; and the depositions of Jacks, Boothe, and PPSI office manager, Doll Ann Johnson ("Johnson"), Finegan prepared a report dated March 25, 2004. *See* [Doc. No. 101, Exhibit 2, March 25, 2004 expert report of Douglas W. Finegan]. After receiving further financial statements, Finegan prepared a supplemental report dated December 28, 2004.

In both reports and in his trial testimony, Finegan identified how PPSI's funds were diverted from Class 5 creditors to pay Class 6 and 7 creditors[6] and for improper expenditures and questionable accounting and management practices between the period June 16, 1998, and the year 2004.

First, Finegan identified improper payment of salaries to family members and to Jacks. PPSI made payments of salaries to Roberta Jacks (Jack's mother), Theron Timothy Jacks, Sr. (Jack's father), Katie Kitchens (Kitchens' daughter), Evelyn Kitchens (Kitchens' mother), and Alvis Kitchens (Kitchens' father). Although PPSI had a small number of employees, PPSI's office manager, Johnson, was not aware whether these family members performed any work for the company. The salaries for the Jacks and Kitchens family members (not including Jacks

---

[5]Wright subsequently died, and PPSI re-hired Boothe.

[6]The Plan defines Class 6 to include "unsecured claims without priority of the insiders of the debtor for loans" and Class 7 as "the shareholders of the debtor." [Doc. No. 115, Exh. 1, Article I].

9

himself) totaled $110,264.17.

Jacks' salary had been set under the Plan at $126,282.00 for his position as secretary/treasurer, but the salary actually paid to him during this period exceeded the set amount by $63,354.[7] At trial, however, Jacks explained that he took over Kitchens' position as president after Kitchens' death and took a $20,000.00 pay increase, considerably less than the amount being paid under the Plan for Jacks' and Kitchens' positions. Finegan admitted that it was reasonable for Jacks to be paid a higher salary than he had been as secretary/treasurer.

Second, Finegan identified payments made by PPSI to pay a personal obligation of Kitchens. Before his death, Kitchens obtained a personal loan at Cross Keys Bank and pledged his stock in PPSI as collateral. Between the time of Kitchens' death and June 2004, PPSI paid $46,500.00 on the loan. At trial, Kitchens testified that PPSI paid the note in order to obtain the release of Kitchens' stock.

Third, Finegan identified excessive rents paid by PPSI to a related entity. PPSI operates from a building located at 4106 Desiard Street, Monroe, Louisiana. In 1998, 1999, 2000, and 2001, PPSI paid rent to KBJ Properties, L.L.C. ("KBJ") for lease of its building. In 1998, KBJ was owned by Kitchens, Bond, and Jacks. PPSI paid rents of $80,000 in 1998, $72,000 in 1999, $97,022 in 2000, and $43,659 in 2001. Finegan noted that there were irregular payments in the general ledgers, so that rent was paid some months, but not others. The amounts paid from month to month were also inconsistent. Amerisource requested KBJ's tax returns for Finegan's review, but these were not provided.

---

[7] The Bankruptcy Court set Jacks' salary at $4,857.08 for each two-week period or $126,282.00 annually.

After Kitchens' death, KBJ was eventually foreclosed upon by its lender. The Desiard Street building was purchased at Sheriff's Sale by PPSI's accountant, Boothe.[8] Since December 2002, when PPSI began leasing from Boothe, its rent for the same property has been only $2,500.00 per month or $30,000 annually. According to Jacks, Boothe agreed to allow PPSI to pay this amount of rent, which was the interest on the note only, in order to help PPSI while it was having financial difficulties, but that the rent should have been $7,000.00 per month. Jacks did not present Boothe as a witness or present any evidence to support his statement.

Fourth, Finegan identified payments made by PPSI on Jacks' personal obligations. PPSI made a number of payments to Jacks' personal credit cards, to Wal-Mart, to Sam's, for landscaping fees, and for property taxes.

Fifth, Finegan identified payments from PPSI of $77,934.83 to Patient Care Services, Inc. ("PCSI"), a related entity which was owned by Jacks, Kitchens, and John Guerriero.[9] Jacks, who draws a salary from PCSI, explained that it was set up to be a billing consultant company and that it was to buy billing software and then lease the software back to PPSI. Since the bankruptcy, PPSI has used PCSI to borrow money and then loan it to PPSI. Although Jacks characterizes payments to PCSI as "loan repayments," they were recorded in PPSI's financial records as reductions to sales. Amerisource requested PCSI's tax returns, so Finegan could determine the propriety of these payments, but the tax returns were never provided. Finegan found no loan documents to support any alleged loans between PPSI and PCSI.

---

[8] Payments were made to Bancorp South, but the building was purchased by Boothe.

[9] John Guerriero is a senior manager at PPSI.

Sixth, Finegan identified an unusual series of checks payable to cash that were recorded as reductions to sales of PPSI, in addition to the PCSI payments. At trial, he explained that if the checks had been for purchases, they would have been posted to a cost of goods sold account, but, instead, they were posted as reductions to sales. Finegan pointed to this as an example of PPSI's failure to keep its records in accordance with GAAP.[10]

Seventh, Finegan identified cash payments made to Jacks on an accounts payable account. While Jacks characterized some of these payments as salary, Finegan explained that PPSI had an account for salaries of officers where Jacks' salary could have been posted. Finegan stated that there was voluminous activity in this account. Between August 2003 and July 2004, PPSI made payments of $248,000.00 to Jacks.

Eighth, Finegan identified problems with PPSI's use of petty cash. Jacks testified in his deposition that green tickets were used by the office when he was not available to sign a check, but that these tickets were properly accounted for in a daily journal. However, Finegan could not match the green ticket amounts from the Cash Box Daily Reconciliation Form used between January 3, 2003, and June 24, 2004, with the entries in the daily ledger. Jacks explained at trial that some of the cash was used to make payroll advances to employees, including to Jacks himself, but Finegan testified that he had never seen a company make payroll advances out of the cash box.

Ninth, Finegan identified a "reserve fund" maintained by PPSI. The July 31, 2004

---

[10] As another example of PPSI's failure to comply with GAAP, Finegan pointed to the fact that the life insurance proceeds after Kitchens' death were treated as an equity contribution rather than income.

general ledger identified $31,000 in "reserve funds," when no provision for reserve funds is made in the Plan.

Tenth, Finegan points out that PPSI's own records reflected positive Net Cash Flow. Although the Net Cash Flow reports were prepared by PPSI's then-attorney, Rainach, rather than an accountant,[11] his reports showed that PPSI had generated positive Net Cash Flow.[12] However, these monies were not placed in escrow as required by the Plan.

Overall, Finegan found PPSI's management to be "very lax," noting the volume of company checks made out to cash and the related improper recording of financial transactions in the general ledger. [Doc. No. 101, Exh. 2, p. 7]. He concluded that, "within a reasonable amount of accounting certainty, . . . certain financial transactions of PPSI were made that were not in accordance with the reorganization plan, and which appear to violate the bankruptcy agreement and payment preference. This specifically relates to substantial apparent payments to Class 6 and 7 creditors ahead of Class 5 creditors."[13] [Doc. No. 101, Exh. 2, p. 10].

The Court finds the evidence of Amerisource persuasive and the testimony of Finegan credible. While Jacks also testified credibly about his practices at PPSI, he did not present

---

[11]Rainach's Net Cash Flow reports relied on financial statements from Boothe for the years 1998-2000 and from Wright for the years 2000-2003.

[12]Based on Rainach's reports, PPSI had positive Net Cash Flow of $677,018.86 between February 1999 and June 2001, from which it should have placed 30% or $203,105.65 in escrow for its Class 5 creditors. These amounts did not account for payments made to Class 6 and 7 creditors in violation of the Plan.

[13]Finegan reached this conclusion in his March 2004 report, but stated in his December 2004 report that PPSI had continued and expanded "the questionable practices discussed in our March 25, 2004 report." [Doc. No. 101, Exh. 3, p. 3].

13

testimony or other evidence which rebutted the findings of Finegan and the independent accountant, Lowery.

> B. **CONCLUSIONS OF LAW**
>
> 1. **Piercing the Corporate Veil**

It is well settled that a corporation is a distinct legal entity, separate from the individuals who comprise it. La. Civ. Code art. 24 (A corporation is a "juridical person" with a "personality," which is "distinct from that of its members."); La. Rev. Stat. 12:93B (A shareholder is not personally liable for the debts and liabilities of the corporation). "However, in a few limited situations, a litigant can reach an individual shareholder by 'piercing the corporate veil,' thereby rendering the individual liable for the debts incurred by the corporation." *Cahn Electric Appliance Co., Inc. v. Harper*, 430 So.2d 143, 145 (La. App. 2 Cir. 1983) (citing *Liberto v. Villard*, 386 So.2d 930 (La. App. 3 Cir. 1980)).

A court may ignore the corporate fiction and hold an individual shareholder liable where the corporation is found to be the "alter ego" of the shareholder. *Riggins v. Dixie Shoring Co.*, 590 So.2d 1164, 1168 (La. 1992). In such situations, the shareholder has usually acted fraudulently or deceitfully. *Id.* (citations omitted). "Another basis for piercing the corporate veil is when [a] shareholder[] disregard[s] the requisite corporate formalities to the extent that the corporation ceases to be distinguishable from [the shareholder]." *Id.* (citations omitted).

When determining whether an individual has acted as the alter ego of the corporation, the court must consider the totality of the circumstances. Factors to be considered include, but are not limited to, the following:

      a.       commingling of corporate and shareholder funds;

      b.       failure to follow statutory formalities for incorporating and transacting corporate affairs;

      c.       undercapitalization;

      d.       failure to provide separate bank accounts and bookkeeping records; and

      e.       failure to hold regular shareholder and director meetings.

*Id.* at 1168-69.

The Court finds that Amerisource has met its burden of showing that PPSI was Jacks' alter ego.[14] Since Kitchens' death, Jacks has been responsible for the running of PPSI and the only shareholder employed by the corporation. Since at least 2003, he has been sole shareholder as well. Serving as sole shareholder, Chief Executive Officer, and Chief Operating Officer, Jacks commingled the funds of PPSI with his own funds and those of two related entities, KBJ and PCSI. He also failed to follow the formalities for conducting corporate affairs. He admits that PPSI was undercapitalized and that he used his personal funds to transact the business of PPSI. Although PPSI had Net Cash Flow, as defined in the Plan, Jacks diverted those monies to

---

[14]Jacks also serves as an officer and director of PPSI. Generally, if directors and officers of a corporation do not purport to bind themselves individually, they do not incur personal liability for debts of the corporation. *DeRoche v. P & L Construction Materials, Inc.*, 554 So.2d 717, 719 (La. App. 5 Cir. 1989)(citations omitted); *First Downtown Development v. Cimochowski*, 613 So.2d 671, 675 (La. App. 2 Cir. 1993) (citing *DeRoche*). However, Louisiana Revised Statute 12:95 specifically preserves the rights any person may have against a director or officer because of the individual's fraudulent practices. Amerisource has argued only that the Court pierce the corporate veil based on Jacks' role as a shareholder. Therefore, the Court need not address his role as officer or director in its analysis of this claim.

pay excessive salaries to his and Kitchens' family members[15]; to pay a personal loan Kitchens incurred prior to his death; for excessive lease payments to KBJ; and for unsubstantiated loan repayments to PCSI, an entity from which he also receives a salary. Jacks used the cash box at PPSI as a personal bank to provide money for his personal expenses and to make payroll advances to other employees as well. Finally, PPSI paid for Jacks' personal obligations and made excessive payments to him on an accounts receivable account.[16]

Under these circumstances, the Court renders judgment in favor of Amerisource and against Jacks and holds Jacks personally liable for the debt of PPSI to Amerisource in the amount of $437,382.11, plus 6% interest from the date of judicial demand.

## 2. Intentional Interference with Contractual Relations

An officer of a corporation owes a duty to third parties in a contractual relationship with the corporation to refrain from acts intentionally causing the corporation to breach the contract or to make performance more burdensome, difficult, or impossible. *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228, 231 (La. 1989).

The officer will be held liable only where he did not have a reasonable justification for his conduct; an officer's conduct was reasonably justified if he acted within the scope of his corporate authority and in the reasonable belief that his action was for the benefit of the

---

[15]The Court rejects Amerisource's contention that the amounts paid to Jacks and accounted for as his salary were excessive. Although those amounts may have exceeded what was set for the role of secretary/treasurer under the Plan, Jacks took on the role of president as well, and the amounts paid to him were far less than those provided for both president and secretary/treasurer.

[16]Although Jacks suggests that at least some of the amounts paid to him were salary and repayment of loans, this practice in itself only serves to prove how the corporate structure was ignored in favor of treating PPSI as a sole proprietorship.

16

corporation. *Id.* On the other hand, where an officer "knowingly and intentionally act[s] against the best interest of the corporation or outside the scope of [his] authority, [he] can be held liable by the party whose contract right has been damaged." *Id.*

The Court finds that Jacks, in his capacity as an officer, intentionally interfered with the contractual relationship between PPSI and a third party, Amerisource. The Plan was a valid contract between PPSI and Amerisource. Jacks served as a corporate officer prior to and since the time the Plan was implemented, and he was aware of PPSI's obligations under the Plan. Once Kitchens died in 1998, Jacks was the sole officer and shareholder actively involved in the management of PPSI.

In his role as officer, Jacks intentionally interfered with PPSI's contractual obligations by failing to have Net Cash Flow reports prepared in accordance with the Plan and GAAP and failing to place 30% of PPSI's positive Net Cash Flow into an interest-bearing account each month. Although positive Net Cash Flow was available, Jacks prevented PPSI from making distributions to Amerisource by instead making distributions to Class 6 and 7 creditors and otherwise diverting PPSI funds.

During his testimony, Jacks explained that he made decisions he felt were best for PPSI after consulting with other directors and officers. However, the Court finds that Jacks' belief was not reasonable and thus his conduct was not justified, given PPSI's bankruptcy and the clear dictates of the Plan.[17]

---

[17]Jacks also made some attempt to blame PPSI's former accountant, Wright. Even if Wright was ill prior to his death and failed to use GAAP without Jacks' knowledge or approval, it was Jacks' actions that resulted in PPSI's breach of contract.

Accordingly, judgment is also entered in favor of Amerisource and against Jacks on this claim.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Amerisource and against Jacks on its claims that the corporate veil should be pierced and that Jacks intentionally interfered with the contract between Amerisource and PPSI. Judgment is rendered in favor of Amerisource on both claims.

MONROE, LOUISIANA, this 7th day of August, 2006.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE